**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JAMES BENNETT, *et al.*, | |
| Plaintiffs, | Civil Action<br>Jury Trial Demanded |
| v. | No. 1:10-cv-04968 |
| UNITEK GLOBAL SERVICES LLC, *et al.*, | Judge Harry D. Leinenweber |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF JAMES BENNETT**

**BUTLER RUBIN SALTARELLI & BOYD LLP**
Jason S. Dubner (ARDC # 06257055)
Ursula A. Taylor (ARDC # 6287522)
70 West Madison Street, Suite 1800
Chicago, IL 60602
(312) 444-9660

**FOX ROTHSCHILD LLP**
Colin D. Dougherty
Jonathan D. Christman
Fox Rothschild LLP
10 Sentry Parkway, Suite 200
P.O. Box 3001
Blue Bell, PA 19422-3001
(610) 397-6500

*Attorneys for Defendants*

# **TABLE OF CONTENTS**

I.     INTRODUCTION ............................................................................................ 1

II.    FACTUAL BACKGROUND ......................................................................... 1

    A.    Parties ............................................................................................... 1

    B.    Bennett's Companies ......................................................................... 2

    C.    The Independent Contractor Agreements Between DirectSat and Bennett's Companies .................................................................................. 3

    D.    Bennett's Bankruptcy Filings ........................................................... 4

III.   STANDARD OF REVIEW ........................................................................... 5

IV.   ARGUMENT .................................................................................................. 6

    A.    James Bennett's FLSA Claims Fail As a Matter of Law. .................... 6

        1.    The FLSA Does Not Apply To Independent Contractors......................... 6

        2.    James Bennett Was an Independent Contractor Under the FLSA.............. 7

    B.    James Bennett's Illinois State Law Claims Also Fail As a Matter of Law. ......... 18

        1.    Bennett Was an Independent Contractor Under the IMWL..................... 18

        2.    Bennett Was an Independent Contractor Under the IWPCA. ................. 19

V.    CONCLUSION............................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

Adams v. Catrambone,
359 F.3d 858 (7th Cir. 2004) .................................................................... 19

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) ................................................................................. 5

Bulaj v. Wilmette Real Estate & Mgmt. Co.,
No. 09-6263, 2010 WL 4237851 (N.D. Ill. Oct. 21, 2010) (Kim, J.) .............................. 6, 18

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) ................................................................................. 5

Chao v. Mid-Atlantic Installation Servs.,
16 Fed. Appx. 104 (4th Cir. 2001) ..............................................................passim

Dole v. Amerilink Corp.,
729 F. Supp. 73 (E.D. Mo. 1990) ...............................................................passim

EEOC v. Century Broad. Corp.,
No. 89-5842, 1990 WL 43286 (N.D. Ill. Mar. 23, 1990) ..................................... 11

Estate of Suskovich v. Anthem Health Plans of Virginia, Inc.,
553 F.3d 559 (7th Cir. 2009) ..................................................................... 6

Franzoni v. Hartmarx Corp.,
No. 99-4998, 2001 WL 243394 (N.D. Ill. Mar. 12, 2001) (Leinenweber, J.) ......................... 5

Freund v. Hi-Tech Satellite,
185 Fed. Appx. 782 (11th Cir. 2006) ..........................................................passim

Jaramillo v. Garda, Inc.,
No. 12-0662, 2012 WL 4955932 (N.D. Ill. Oct. 17, 2012) ..................................... 5

Karr v. Strong Detective Agency, Inc.,
787 F.2d 1205 (7th Cir. 1986) ..................................................................... 6

Lizak v. Great Masonry, Inc.,
No. 08-1930, 2009 WL 3065396 (N.D. Ill. Sept. 22, 2009) ................................... 18

Scantland v. Jeffry Knight, Inc.,
No. 09-1985, 2012 WL 1080361 (M.D. Fla. Mar. 29, 2012) .........................passim

Sec. of Labor, U.S. Dept. of Labor v. Lauritzen,
   835 F.2d 1529 (7th Cir. 1987) .................................................................................... passim

U.S. v. Silk,
   331 U.S. 704 (1947) .............................................................................................................. 6

Vince v. Ill. Central Sch. Bus, LLC,
   No. 09-5360, 2011 WL 578832 (N.D. Ill. Feb. 9, 2011) (Leinenweber, J.) ........................ 5

Worth v. Tyer,
   276 F.3d 249 (7th Cir. 2001) ............................................................................................... 16

STATE CASES

Novakovic v. Samutin,
   820 N.E.2d 967, 354 Ill. App. 3d 660 (1st Dist. 2005) ....................................................... 19

People ex rel. Dep't of Labor v. MCC Home Health Care, Inc.,
   790 N.E.2d 38, 339 Ill. App. 3d 10 (1st Dist. 2003) .......................................................... 18

FEDERAL STATUTES

29 U.S.C. § 201 ......................................................................................................................... 1

29 U.S.C. § 203(d) .................................................................................................................... 6

29 U.S.C. § 203(e)(1) ................................................................................................................ 6

29 U.S.C. § 203(g) ..................................................................................................................... 6

STATE STATUTES

820 ILCS §§ 105/1 et seq., and ............................................................................................... 17

820 ILCS §§ 115/1 et seq. ........................................................................................................ 17

820 ILCS § 115/2 ..................................................................................................................... 19

RULES

Fed. R. Civ. P. 56(a) .................................................................................................................. 5

REGULATIONS

Illinois Administrative Code ......................................................................................... 18, 19, 20

Defendants DirectSat USA, LLC ("DirectSat") and UniTek Global Services, Inc. ("UniTek") (together, "Defendants"), by and through their attorneys, Fox Rothschild LLP and Butler Rubin Saltarelli & Boyd LLP, hereby submit this Memorandum of Law in support of their Motion for Summary Judgment as to Plaintiff James Bennett ("Bennett").

## I.   INTRODUCTION

Notwithstanding the fact that Bennett signed multiple independent contractor agreements with DirectSat on behalf of Illinois installation companies he incorporated, wholly owned, and solely managed, he filed this action claiming that he was an employee of DirectSat and that DirectSat failed to pay him appropriate wages and proper overtime compensation in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq., and Illinois wage-and-hour law. In addition to the express terms of these independent contractor agreements, as well as his various certifications filed under penalty of perjury to the bankruptcy court, the undisputed facts of this case demonstrate that Bennett, the owner and president of these companies, was not a DirectSat employee but instead an independent contractor. As such, this motion is ripe and all of his claims fail as a matter of law.

## II.   FACTUAL BACKGROUND

### A.   Parties

DirectSat is a Delaware limited liability company with its principal place of business in Montgomery County, Pennsylvania. SOF, ¶ 1. DirectSat employs individuals who install, upgrade, and service DirecTV customers and it also conducts business with subcontracting companies to perform installation work through the use of independent contractors. SOF, ¶¶ 3-4. Although DirectSat began operations before 2006, it did not operate in Illinois until late 2006 and it has operated continuously in Illinois since that date. SOF, ¶ 5. UniTek is a Delaware corporation with corporate offices located in Montgomery County, Pennsylvania. SOF, ¶ 2.

James Bennett is an individual who, contrary to various documents and bankruptcy filings he certified, now has reversed course in this case and claims to have been an employee of DirectSat and UniTek. Bennett alleges violations of the FLSA and Illinois law. SOF, ¶ 6.[1]

## B. Bennett's Companies

Bennett formed an Illinois company, Unlimited Wiring, Inc. ("Wiring"), in or around 2004 to make a living doing installation work – initially in the field of telecommunications. SOF, ¶¶ 7-8. Bennett filed articles of incorporation for this company. SOF, ¶ 20. In 2004, Bennett started performing satellite installation work after gaining those skills from "on-the-job training" with a company that was neither of the Defendants, nor affiliated with any of the Defendants. SOF, ¶ 9. Bennett was the sole owner of Wiring at the time of its formation and throughout its existence. SOF, ¶ 10. He also served as president and managing executive of Wiring. SOF, ¶ 11.

Wiring was dissolved in 2009, whereupon Bennett started another company, Unlimited, LLC ("Unlimited"), that did the same work as Wiring and operated from the same location. SOF, ¶¶ 12-14, 17. Similar to Wiring, Bennett has been the sole owner and president of Unlimited at the time of its formation and throughout its existence. SOF, ¶¶ 15-16. According to Bennett, the work that Wiring and Unlimited did was and is "basically the same," and his role with the two companies was and is "basically the same" as well. SOF, ¶¶ 18-19. Unlimited still exists as a company, and continues to perform installation work in the state of Illinois. SOF, ¶ 79.

Bennett operated these companies as a business and took appropriate corporate formalities, and other actions, to that effect, including, inter alia, incorporation (SOF, ¶ 20), annual corporate reporting requirements, including paying fees to the State of Illinois (id.),

---

[1]     Jerome Garrison and Jermaine Litt later joined this action as Plaintiffs. (See D.E. 70.) A separate motion for summary judgment is being filed as to their claims. As discussed therein, Garrison and Litt were co-owners of separate and independent Illinois installation companies that were, as Mr. Garrison testified, a "rivalry" to Mr. Bennett's companies. See SOF, ¶ 50.

paying state and federal taxes for the companies (SOF, ¶ 23), maintaining insurances (SOF, ¶ 28), keeping books and records (SOF, ¶ 22), paying an accountant to do the companies' taxes and payroll (SOF, ¶¶ 26-27), paying an attorney for advice on a worker's compensation claim (SOF, ¶ 29), leasing office and storage space (SOF, ¶¶ 31, 33-34, 68), obtaining federal employer identification numbers (SOF, ¶ 21), applying for and receiving business licenses (SOF, ¶¶ 30, 32), starting a business banking account (SOF, ¶¶ 25, 74), employing technicians (SOF, ¶ 62), and entering into written contractual agreements (SOF, ¶¶ 36, 38, 42).

## C. The Independent Contractor Agreements Between DirectSat and Bennett's Companies

In addition to the foregoing matters, Bennett, as sole owner, president and managing executive of these companies, entered into independent contractor agreements with DirectSat on behalf of Wiring in or around September 2006 and on behalf of Unlimited in or around April 2009. SOF, ¶¶ 36, 39-40, 42, 44-45.[2] The contractual term period for both of these agreements was one-year, although the 2009 agreement was terminated only a few months after being executed by the companies. SOF, ¶¶ 41, 46-47. Bennett admits that his companies were not in a contractual relationship with DirectSat for the whole time between the execution of these agreements. SOF, ¶ 49. Both agreements identify Bennett's companies as an "Independent Contractor," "Contractor" or "Subcontractor." SOF, ¶¶ 37, 43. None of the agreements referred to Bennett (or his companies) as anything other than a contractor.

As set forth in these contracts, Bennett's companies had to supply their own tools, ladders, and vehicles because DirectSat did not provide them. SOF, ¶¶ 51-52. When Wiring signed the 2006 agreement, it had between five and twelve technicians performing installation work, as permitted under the agreement. SOF, ¶¶ 54, 62. However, as owner and president of

---

[2]     UniTek was not a party to either of these agreements. SOF, ¶ 48.

Wiring and Unlimited, Bennett chose not to provide tools, vehicles, and installation materials to his companies' technicians. SOF, ¶¶ 69-71. During the period when his companies were under contract with DirectSat, Bennett testified that his responsibilities as owner of these companies was "everything," including, inter alia, managing payroll, picking up equipment for his companies' technicians, supervising his technicians in the field, and maintaining the companies' bank accounts and insurances. SOF, ¶¶ 66-67. Bennett was also responsible for withholding taxes under these agreements. SOF, ¶ 60.

Under these agreements, Bennett's companies were free to accept or reject installation jobs. SOF, ¶ 56. Bennett's companies were also free to engage other independent contracting activities. SOF, ¶ 61. Upon accepting work orders under the agreements, Bennett's companies invoiced DirectSat for the installation work performed by the companies' technicians. SOF, ¶ 63. Bennett's companies were paid by DirectSat in weekly checks for all of the work performed by those technicians. SOF, ¶ 64. Bennett's technicians were paid for their installation work from his companies' bank accounts with checks signed by Bennett. SOF, ¶ 65.

Pursuant to these agreements, Bennett's companies had to complete their installation jobs pursuant to certain minimum specifications, including safety standards, and the companies' installations were subject to quality control review. SOF, ¶ 55. Bennett's companies could be backcharged based upon their failure to comply with certain installation guidelines. SOF, ¶ 57. And, when Bennett's companies were charged back by DirectSat based upon work performed by their technicians, or lost equipment, Bennett, as owner and president of these companies, chose to pass that chargeback on to the companies' technicians. SOF, ¶¶ 58-59.

### D.     Bennett's Bankruptcy Filings

Before and after filing this lawsuit, Bennett submitted multiple bankruptcy filings in the U.S. Bankruptcy Court for the Northern District of Illinois in which he identified, under penalty

of perjury, that he was either "self-employed" or that his employer was one of his companies. SOF, ¶¶ 73, 75-77. He identified the address of his employer as the company address for Wiring and Unlimited. SOF, ¶¶ 75, 77. None of his bankruptcy filings identify either DirectSat or UniTek as his employer.

## III.  **STANDARD OF REVIEW**

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Jaramillo v. Garda, Inc., No. 12-0662, 2012 WL 4955932, at *1 (N.D. Ill. Oct. 17, 2012). "A fact is material if it could affect the outcome of the suit, and a dispute is genuine where the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Vince v. Ill. Central Sch. Bus, LLC, No. 09-5360, 2011 WL 578832, at *4 (N.D. Ill. Feb. 9, 2011) (Leinenweber, J.) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The moving party bears the burden of establishing the grounds for summary judgment "with the evidence demonstrating the absence of any genuine issue of material fact." Vince, 2011 WL 578832, at *4. Once the moving party has satisfied this burden, the nonmoving party "may not rest on mere allegations, but must present specific facts showing that a genuine issue exists for trial." Id. Indeed, the "non-moving party 'must do more than show that there is some metaphysical doubt as to the material facts.'" Jaramillo, 2012 WL 4955932, at *1. Thus, to defeat a motion for summary judgment, the non-moving party "may not rest on its pleadings, but 'must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial.'" Franzoni v. Hartmarx Corp., No. 99-4998, 2001 WL 243394, at *3 (N.D. Ill. Mar. 12, 2001) (Leinenweber, J.) (citing Robin v. Espo Eng'g Corp., 200 F.3d 1081, 1088 (7th Cir. 2000)).

## IV.    ARGUMENT

### A.    James Bennett's FLSA Claims Fail As a Matter of Law.

#### 1.    The FLSA Does Not Apply To Independent Contractors.

Critically, "[i]t is undisputed that the provisions of the FLSA do not apply unless there is a valid employer-employee relationship." Bulaj v. Wilmette Real Estate & Mgmt. Co., No. 09-6263, 2010 WL 4237851, at *4 (N.D. Ill. Oct. 21, 2010) (Kim, J.); see also Sec. of Labor, U.S. Dept. of Labor v. Lauritzen, 835 F.2d 1529, 1534-35 (7th Cir. 1987) ("independent contractors" not subject to FLSA requirements).[3] The determination of a worker's employment status is a legal determination. Karr v. Strong Detective Agency, Inc., 787 F.2d 1205, 1206 (7th Cir. 1986).

To determine whether an individual worker is an "employee" under the FLSA, this Court must consider the "six-factor test to determine the 'economic reality' of the situation." Estate of Suskovich v. Anthem Health Plans of Virginia, Inc., 553 F.3d 559, 565 (7th Cir. 2009) (citing Lauritzen, 835 F.2d at 1534). Those six factors are:

> 1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed; 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; 3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers; 4) whether the service rendered requires a special skill; 5) the degree of permanency and duration of the working relationship; 6) the extent to which the service rendered is an integral part of the alleged employer's business.

Lauritzen, 835 F.2d at 1534-35; see also U.S. v. Silk, 331 U.S. 704, 716 (1947). In applying these factors to assess the "economic reality of the nature of the working relationship, courts do

---

[3]     The Act defines an employee as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). An "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). Moreover, under the FLSA, to "[e]mploy" means "to suffer or permit work." 29 U.S.C. § 203(g).

not look to a particular isolated factor but to all the circumstances of the work activity." <u>Lauritzen</u>, 835 F.2d at 1534.

## 2. <u>James Bennett Was an Independent Contractor Under the FLSA.</u>

There can be no genuine dispute that Bennett, the owner and president of multiple Illinois installation companies was, in fact, an independent contractor during the period in which he now claims, in this lawsuit, to have been an employee of DirectSat. As shown below, considering the six <u>Lauritzen</u> factors in the case at bar, the undisputed facts of this case demonstrate that Bennett was not an employee of the Defendants under the FLSA but instead an independent contractor.[4]

Indeed, several courts across the country considering wage-and-hour claims made by cable and satellite installers, including the Fourth and Eleventh Circuits, have rejected such claims and found these plaintiffs to be independent contractors rather than employees. <u>See, e.g.</u>, <u>Chao v. Mid-Atlantic Installation Servs.</u>, 16 Fed. Appx. 104, 106-08 (4th Cir. 2001) (citing <u>Lauritzen</u>, and affirming district court's summary judgment conclusion that cable installer was an independent contractor); <u>Freund v. Hi-Tech Satellite</u>, 185 Fed. Appx. 782, 783-84 (11th Cir. 2006) (citing <u>Lauritzen</u>, and affirming district court's determination that home satellite and entertainment installer was an independent contractor); <u>Scantland v. Jeffry Knight, Inc.</u>, No. 09-1985, 2012 WL 1080361, at *5-6, *13-19 (M.D. Fla. Mar. 29, 2012) (granting defendants' motion for summary judgment after finding that technician installers were independent contractors under the six-factor test); <u>Dole v. Amerilink Corp.</u>, 729 F. Supp. 73, 76-77 (E.D. Mo. 1990) (citing <u>Lauritzen</u>, and finding that cable installers were independent contractors).

---

[4]     As noted above, no single factor is dispositive of an individual's employment status, and, in the same vein, not all factors need weigh in favor of the non-existence of an employee-employer relationship in order to conclude that an individual is, in fact, not an employee. <u>See</u> <u>Lauritzen</u>, 835 F.2d at 1534-35. With that said, because all six factors must be considered by this Court, they will be addressed in turn below.

And, in fact, the evidence establishing independent contractor status in this case is even more compelling than the cases cited above as this action involves the owner, president and managing executive (i.e., Mr. Bennett) of formally incorporated and independently existing corporate entities in the State of Illinois (i.e., Wiring and Unlimited) that employed the services of other technicians during the period in which Bennett now claims to have been an employee of DirectSat. SOF, ¶¶ 7-35, 38, 62, 78. Moreover, in multiple bankruptcy filings submitted to the U.S. Bankruptcy Court for the Northern District of Illinois both before and after this lawsuit was commenced, Bennett identified his employer as "self-employed" or "Unlimited" – and never once identified DirectSat or UniTek as his employer. SOF, ¶¶ 73-77. Also, during his deposition, he admitted that he was an employee of Wiring. SOF, ¶ 72. Accordingly, Bennett is an independent contractor, not an employee of DirectSat. As such, the FLSA does not apply and, as a result, Bennett's claims is this matter must fail as a matter of law.

### a.    The Nature and Degree of Control

The first Lauritzen factor is the "nature and degree" of DirectSat's control "as to the manner in which the work is to be performed." See Lauritzen, 835 F.2d at 1535. Contrary to Bennett's unsupported and conflicted assertions, in the case at bar, DirectSat did not control the manner and amount of work performed by Bennett, or even whether Bennett worked at all. Most importantly, before he ever had any working relationship with DirectSat, Bennett established his own subcontracting installation company incorporated in Illinois and, in fact, he had entered contractual agreements with other clients before contracting with DirectSat. SOF, ¶¶ 7-11, 20-34, 38. He later started a new company that performed the same work and that company continues to exist to this day and operate in the State of Illinois. SOF, ¶¶ 12-19, 79. That company, however, does not presently contract with DirectSat for work, even though DirectSat also continues to operate in the State of Illinois. SOF, ¶ 5.

8

Bennett operated these installation companies as a business and, on behalf of these companies, Bennett did all of the following: (1) Paid the incorporation fee and the annual corporate fees to the State of Illinois (SOF, ¶ 20); (2) Made the annual corporate reporting requirements (id.); (3) Kept books and records (SOF, ¶ 22); (4) Paid state and federal taxes as a company (including writing off the portion of his cell phone expenses related to business) (SOF, ¶¶ 23-24); (5) Paid an accountant to do the company's taxes (SOF, ¶ 26); (6) Requested and received a federal employer identification number (SOF, ¶ 21); (7) Opened and maintained business checking account (SOF, ¶¶ 25, 74); (8) Maintained insurances (SOF, ¶ 28); (9) Engaged an attorney to provide advice on a worker's compensation claim (SOF, ¶ 29); (10) Paid an accountant to do the company's payroll (SOF, ¶ 27); (11) Rented office and storage space (SOF, ¶¶ 31, 33-34, 68); (12) Applied for a business regulation certificate from the village of Evergreen Park, Illinois (SOF, ¶ 32); (13) Paid to receive a business license from Calumet City, Illinois (SOF, ¶ 30); and (14) Entered into written contractual agreements (SOF, ¶¶ 36, 38, 42).

Thus, as sole owner, president, and managing executive of these installation companies, Bennett operated them as a business and, as the exclusive owner and manager, Bennett had complete control of the services completed by these companies and he was free to perform installation work for other companies. SOF, ¶¶ 10-11, 15-16, 56-61. Thus, DirectSat did not exercise control with regard to the hours Bennett worked, the installation jobs he performed, or even whether Bennett worked at all. See Dole, 729 F. Supp. at 76; Scantland, 2012 WL 1080361, at *15 (independent contractor agreement provided that technician installer was free to reject work orders, but alleged employer had discretion regarding the offer of work orders to technician installers). Bennett's companies were free to accept or decline work. SOF, ¶ 56. Also, DirectSat did not determine how many (or even whether Bennett employed) individuals to assist him with

his company and, if so, how he decided to manage them as their supervisor. SOF, ¶ 54; see also Dole, 729 F. Supp. at 76. In fact, when Wiring signed the independent contractor agreement with DirectSat in 2006, it already had between five and twelve technicians performing installation work, as permitted under the agreement. SOF, ¶ 62.

Moreover, controlling the manner of work performed is not equivalent to maintaining minimum specifications for installations or imposing quality controls. See Freund, 185 Fed. Appx. at 783 (satellite installer's "certain minimum specifications" for installations was directed at "customer satisfaction" and "not with the day-to-day regulation of his work habits, hours worked or work methods"); see also Dole, 729 F. Supp. at 76 (the imposition of quality controls on cable installers is the type of constraint that "inheres in any subcontractor relationship"); Scantland, 2012 WL 1080361, at *14 (requiring technician installers to comply with "technical specifications" of the alleged employer's client is "consistent with the standard role of a contractor hired to perform highly technical tasks" and simply involves the "contractual warranties of timely work and quality"). Additionally, "backcharging" an installer for failing to satisfy such specifications does not indicate control but instead is characteristic of a contractor's role. See Scantland, 2012 WL 1080361, at *14; see also Chao, 16 Fed. Appx. at 106 (requiring cable installer to meet "installation specifications" is "entirely consistent with the standard role of a contractor who is hired to perform technical duties").

Thus, as the foregoing authority explains, the specifications related to installations at DirecTV's customers' homes, as well as the imposition of quality controls, that were the subject of the independent contractor agreements entered into by Bennett's companies are inherent and typical for any contractor. See SOF, ¶ 55. Moreover, any backcharges received by Bennett's companies, whether for failure to meet certain specifications in installation jobs completed by his

company or for losing satellite equipment, are characteristic for any contractor. <u>See</u> SOF, ¶ 57. Instead, Bennett, as owner and president of his installation companies, was "responsible for the manner and means of performance of the work, including performing the work free from defects, for assuring compliance with applicable safety standards, for selecting and assigning [his] employees, supervising [his] own employees, and paying all required taxes." <u>See</u> <u>Scantland</u>, 2012 WL 1080361, at *16. As such, the undisputed facts regarding the nature of the relationship between DirectSat and Bennett's companies indicate the absence of DirectSat's control.

### b. <u>Opportunity for Profit and Loss</u>

The second <u>Lauritzen</u> factor is Bennett's "opportunity for profit or loss depending upon his managerial skill." <u>See</u> <u>Lauritzen</u>, 835 F.2d at 1535. In contrast to an employee, an independent contractor "risks loss of an investment and has the opportunity to increase profits through managerial discretion." <u>EEOC v. Century Broad. Corp.</u>, No. 89-5842, 1990 WL 43286, at *4 (N.D. Ill. Mar. 23, 1990) (citing <u>Lauritzen</u>, 835 F.2d at 1536) (Conlon, J.). The incorporation and operation of a separate corporation "indicates the presence of independent entities, each having its own opportunity for profit and loss" because even if a corporation loses its primary client, its existence continues and it can seek new clients. <u>Scantland</u>, 2012 WL 1080361, at *17. As discussed extensively above, Bennett incorporated and operated separate and independent Illinois companies (<u>i.e.</u>, Wiring and Unlimited), one of which (Unlimited) continues to exist and perform installation work in the State of Illinois. SOF, ¶¶ 7, 10-19, 79. The other company, Wiring, pre-dated its contractual relationship with DirectSat. SOF, ¶ 7.

Bennett's profits or losses, as the sole owner of his companies, were governed by his managerial discretion, in both the work he performed (<u>i.e.</u>, how much, how fast, and how well) and the capital investments he made. <u>See</u> <u>Chao</u>, 16 Fed. Appx. at 106-07 (installer's net profit or loss "depends on his skill in meeting technical specifications, thereby avoiding backcharges; on

the business acumen with which the Installer makes his required capital investments in tools, equipment, and a truck; and on the installer's decision whether to hire his own employees or to work alone"); Scantland, 2012 WL 1080361, at *16-17 (completing more work orders, avoiding backcharges, and minimizing costs associated with the purchasing of a vehicle, tools, insurances, licenses); see also Dole, 729 F. Supp. at 76-77 ("rectifying and paying for any damage" caused or faulty installation, as well as purchasing tools, trucks, and insurance is indicative of economic independence and typical for contractors).

Bennett's profit or loss was directly related to how much, how fast, and how well he (and his technicians) completed their work orders because his companies were paid based upon the number of installation jobs completed and any backcharges incurred were the result of his companies' failure to adhere to certain specifications. See SOF, ¶¶ 57, 59, 63-64; see also Chao, 16 Fed. Appx. at 107 (installer can control profits and losses by working "more or fewer hours and, more importantly, by improving their technique so that they can service more customers faster"); Freund, 185 Fed. Appx. at 783 ("by accepting more jobs, performing more efficiently and hiring employees, [installer] could earn greater sums of money"); Scantland, 2012 WL 1080361, at *16.

Both payment and backcharge provided opportunities for profit or loss. Bennett's companies received weekly checks for the installation work performed by his companies' technicians. SOF, ¶ 64. These technicians were then paid from Bennett's companies' bank account in checks signed by Bennett. SOF, ¶ 65. Similarly, as owner and president of his subcontracting installation companies, Bennett chose to pass any backcharges on to his companies' technician who was responsible for the backcharge. SOF, ¶ 58. The fact that Bennett could not dictate the number of customers DirecTV has to service on a given day or the rate at

which his company was paid for each job completed by a technician working for his company, he was "no less in control of [his] net profits as a result of these variables than typical independent contractors." Chao, 16 Fed. Appx. at 107; Scantland, 2012 WL 1080361, at *16.

Additionally, DirectSat did not provide Bennett with a vehicle, tools, or ladders to complete installations. SOF, ¶¶ 51-52. Instead, Bennett had to purchase his own tools and trucks, a substantial investment in capital that is typical of contractors. See Scantland, 2012 WL 1080361, at *17; Dole, 729 F. Supp. at 76. For business reasons, he chose not to make these purchases for any technicians working for his companies. See SOF, ¶¶ 69, 71. Bennett's companies were also responsible for maintaining insurances and withholding taxes. SOF, ¶¶ 28, 60.

In addition to the foregoing decisions, Bennett testified that he paid an accountant to do his companies' taxes and, for a time, even paid the same accountant to do his companies' payroll. SOF, ¶¶ 26-27. Bennett also testified that he paid for separate storage space for all of the satellite equipment his companies received and, for a period of time, even leased office space. SOF, ¶¶ 31, 33-34, 68. In fact, Bennett moved his office location from Evergreen Park to Calumet City because the latter space had a "cheaper rate." SOF, ¶ 33. All of these decisions regarding employees, equipment, insurances, taxes, payroll, renting space, and the like, affect his profit or loss margin as the owner of the company.

Furthermore, and critically, Bennett's decision, on behalf of his companies, to enter a written contractual agreement with another company demonstrates the very essence of Bennett's opportunity for profit or loss. Before Wiring ever entered into an independent contractor agreement with DirectSat, it had a written contractual agreement with a different company. SOF, ¶ 38. Then, on behalf of Wiring, Bennett approached DirectSat in order to form a contractual

13

agreement. SOF, ¶¶ 35-36, 39-40. More than a year after this first contract had expired, Bennett entered into another independent contractor agreement with DirectSat. SOF, ¶¶ 42, 44-45. In both agreements, Bennett acknowledged that his companies were independent contractors, and not employees, of DirectSat. SOF, ¶¶ 37, 43. Thus, any profit or loss is Bennett's own and "results from [his] own efforts." See Dole, 729 F. Supp. at 77. The undisputed facts demonstrate that Bennett, as the owner of these incorporated companies, had the opportunity for individual profit and loss and that this opportunity is directly tied to his managerial skill.

### c. **Investment in Equipment and Employment of Others**

The third Lauritzen factor is Bennett's "investment in equipment or materials required for his task, or his employment of workers." See Lauritzen, 835 F.2d at 1535. In this case, Bennett's investment in equipment and materials is substantial. As discussed above, Bennett had to purchase his own equipment, such as ladders and tools, to perform installations for DirecTV customers and supply his own vehicle because DirectSat did not provide these to him. SOF, ¶¶ 51-52. As other courts have found under circumstances involving other installers, these substantial investments strongly weigh in favor of concluding that Bennett was an independent contractor. See Scantland, 2012 WL 1080361, at *17 (technician installers "provided their own vehicles, paid for their own gas, purchased their own tools and safety equipment, purchased their own commercial liability and automobile insurance, paid for uniforms and signs, paid for their own telephone service, and paid their own taxes"); Freund, 185 Fed. Appx. at 783-84 (plaintiff installer "procured all of the equipment necessary to perform the installations," "drove his own vehicle," and "provided his own tools and supplies for each installation").

The fact that many of these expenses were the subject of the independent contractor agreements that Bennett, as owner of his companies, signed with DirectSat (e.g., the contract required Bennett's company to maintain insurances) does not alter the significance of these

investments. In <u>Chao</u>, the contract between the plaintiff installers and the alleged employer required the installers in that case to supply their own trucks, a 28-foot ladder, specialized tools, uniforms, and pagers. 16 Fed. Appx. at 107; <u>see</u> <u>also</u> <u>Dole</u>, 729 F. Supp. at 76 (cable installers had to provide their own tools and trucks "in order to do work" for the alleged employer). As further evidence of a substantial investment in a separate installation business, under the contract at issue in <u>Chao</u>, installers were responsible for obtaining their own liability and automobile insurance and for withholding their own or any of their employees' taxes. 16 Fed. Appx. at 107; <u>see</u> <u>also</u> <u>Dole</u>, 729 F. Supp. at 76 (installers responsible for purchasing their own insurance).

These foregoing requirements are similar to the requirements of the independent contractor agreements at issue in this case. Pursuant to the terms of these agreements, Bennett was responsible for providing (and did provide) his own tools and vehicle, his own insurances, and tax withholdings. SOF, ¶¶ 28, 51-52, 60. All of these costs "are of a type not normally borne by employees." <u>Scantland</u>, 2012 WL 1080361, at *17; <u>see</u> <u>also</u> <u>Dole</u>, 729 F. Supp. at 76; <u>Chao</u>, 16 Fed. Appx. at 107. Furthermore, in addition to making significant capital expenditures on equipment, materials, insurances, and the like, Bennett had between five and twelve technicians working for his company who were performing installation work on behalf of the his company. SOF, ¶ 62. Accordingly, the undisputed facts regarding Bennett's investment in equipment and in the employment of others demonstrate that he was an independent contractor.

### d.    Special Skill

The fourth <u>Lauritzen</u> factor is whether the "service rendered" by Bennett "requires a special skill." <u>See</u> <u>Lauritzen</u>, 835 F.2d at 1535. In this case, Bennett performed satellite installation work pursuant to contractor agreements he entered on behalf of his wholly owned installation companies with DirectSat. Bennett was not trained by DirectSat; instead, he learned

the skills to do satellite installation work after receiving training from a company not affiliated with either of the Defendants. SOF, ¶¶ 9, 53.

Several courts have concluded that individuals performing similar satellite and cable installation work possessed "special skills" in order to perform their work. See Chao, 16 Fed. Appx. at 107 (skills of cable installer are "akin to those of carpenters, construction workers, and electricians"); Freund, 185 Fed. Appx. at 784 (home satellite and entertainment installer had special skills); Dole, 729 F. Supp. at 77 (concluding that cable installers "possess the special skills of carpenters and electricians"); Scantland, 2012 WL 1080361, at *17 (technicians who install and repair high-speed internet, cable television, and telephone services involve "technical skill"). Accordingly, the undisputed facts regarding Bennett's installation work involving similar special skills demonstrate that he was an independent contractor.

### e.     Degree of Permanency in Working Relationship.

The fifth Lauritzen factor is the "degree of permanency and duration of the working relationship" between Bennett and DirectSat. See Lauritzen, 835 F.2d at 1535. "Contracts of a set length often indicate independent contractor status." Worth v. Tyer, 276 F.3d 249, 264 (7th Cir. 2001) (citing Mazzei v. Rock N Around Trucking, Inc., 246 F.3d 956, 965 (7th Cir. 2001)). In this case, the working relationship between Bennett and DirectSat was not permanent. Bennett signed two separate independent contractor agreements with DirectSat, one in 2006 and another in 2009. SOF, ¶¶ 36, 39-40, 42, 44-45. Bennett has admitted that his companies were not under contract with DirectSat between the expiration of the first agreement and the execution of the second agreement. SOF, ¶ 49. Moreover, pursuant to the contractual terms of these agreements, the duration of the relationship between DirectSat and Bennett's companies was the set length of

one-year, unless the agreement was terminated. SOF, ¶¶ 41, 46; see also Worth, 276 F.3d at 264 (contracts for a set length of time signify independent contractor status).[5]

Additionally, both agreements allowed Bennett to enter other contractual agreements for installation work during the tenure of his relationship with DirectSat. SOF, ¶ 61; see also Freund, 185 Fed. Appx. at 784 (working relationship not permanent because plaintiff installer "was able to take jobs from other installation brokers" and plaintiff "could take as many or as few jobs as he desired"). Further, in both agreements, Bennett acknowledged that his companies were independent contractors, and not employees, of DirectSat. SOF, ¶¶ 37, 43. Accordingly, the undisputed facts regarding the lack of permanency in the working relationship between DirectSat and Bennett's subcontracting companies demonstrate that he was an independent contractor.

### f.  Integral Part of Business.

The sixth and final Lauritzen factor is the extent to which the "service rendered" by Bennett is an "integral part" of DirectSat's business. See Lauritzen, 835 F.2d at 1535. Even if this factor appears to weigh in favor of employment because DirectSat only provides fulfillment installation services to DirecTV and contracts with subcontracting companies to provide some of these services[6], it is not dispositive. See Lauritzen, 835 F.2d at 1534-35 (no single factor is controlling in determining an individual's employment status). Given all of the undisputed evidence demonstrating that Bennett was an independent contractor, the fact that DirectSat's only client is DirecTV "does not alter the overall impression" that Bennett's subcontracting installation companies are "economically independent" from DirectSat. See Dole, 729 F. Supp.

---

[5]     In fact, the latter agreement, executed in April 2009, was terminated only a few months later, in July 2009. SOF, ¶ 47.

[6]     Unlike DirectSat, Defendant Unitek does not have a contract with DirecTV.

at 77 (importance of cable installers to alleged employer did not "tip" the balance toward a finding of an employee-employer relationship); see also Chao, 16 Fed. Appx. at 107-08.

## B.  James Bennett's Illinois State Law Claims Also Fail As a Matter of Law.

Bennett has also asserted claims under Illinois wage-and-hour law: the Illinois Minimum Wage Law ("IMWL"), 820 ILCS §§ 105/1 et seq., and the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS §§ 115/1 et seq. For the same reasons discussed above, Bennett's state law claims also fail as a matter of law.

### 1.  Bennett Was an Independent Contractor Under the IMWL.

With respect to Bennett's IMWL claims, the Illinois Administrative Code provides six factors that are essentially *verbatim* to the six Lauritzen factors, discussed above, for determining whether a worker is an employee or independent contractor:

> [1] the degree of control the alleged employer exercised over the individual; [2] the extent to which the services rendered by the individual are an integral part of the alleged employer's business; [3] the extent of the relative investments of the individual and alleged employer; [4] the degree to which the individual's opportunity for profit and loss is determined by the alleged employer; [5] the permanency of the relationship; [and] [6] the skill required in the claimed independent operation.

See Lizak v. Great Masonry, Inc., No. 08-1930, 2009 WL 3065396, at *8 (N.D. Ill. Sept. 22, 2009) (citing 56 Ill. Adm. Code § 210.110) (Coar, J.); Bulaj, 2010 WL 4237851, at *10; see also People ex rel. Dep't of Labor v. MCC Home Health Care, Inc., 790 N.E.2d 38, 44-45, 339 Ill. App. 3d 10, 19-21 (1st Dist. 2003) (holding that the six-part test in the Illinois Administrative Code is the proper test for determining whether an individual is an employee or independent contractor under the IMWL). "Therefore, the inquiry for determining employment status under the IMWL is essentially the same as that under the FLSA." Bulaj, 2010 WL 4237851, at *10; Lizak, 2009 WL 3065396, at *8. Accordingly, for the reasons discussed in Section IV.A.1, supra,

18

Bennett's state law claims under the IMWL fail as a matter of law because he is an independent contractor, not an employee under that statute.

### 2.     <u>Bennett Was an Independent Contractor Under the IWPCA</u>.

Similarly, although the analysis under the IWPCA is slightly different from the parallel inquiry under the FLSA and IMWL, Bennett's claims under this Illinois statute also fail for the same reason: Bennett is an independent contractor. The IWPCA defines an "employee" as "any individual permitted to work by an employer in an occupation." 820 ILCS § 115/2. However, the IWPCA excludes from its definition of an employee any individual:

> (1) who has been and will continue to be free from control and direction over the performance of his work, both under his contract of service with his employer and in fact; and
>
> (2) who performs his work which is either outside the usual course of business or is performed outside all of the places of business of the employer unless the employer is in the business of contracting with third parties for the placement of employees; and
>
> (3) who is in an independently established trade, occupation, profession or business.

<u>Id.</u> For an individual to be classified as an independent contractor under the IWPCA, Illinois courts hold that all three factors of this exclusion must be satisfied. <u>Adams v. Catrambone</u>, 359 F.3d 858, 864-65 (7th Cir. 2004); <u>Novakovic v. Samutin</u>, 820 N.E.2d 967, 973-74, 354 Ill. App. 3d 660, 668 (1st Dist. 2005); <u>see</u> <u>also</u> 56 Ill. Adm. Code § 300.460(a) ("All three conditions enumerated in Section 2 of the Act must be satisfied for the independent contractor exemption to apply."). "This exclusion is designed to distinguish between protected employees and independent contractors, who are not protected." <u>Adams</u>, 359 F.3d at 862 n.4.

Regarding the first element of this exemption, the Illinois Administrative Code provides that "control" means "the existence of general control or right to general control, even though the details of work are left to an individual's judgment." 56 Ill. Adm. Code § 300.460(a)(1). As

discussed above, the nature of the working relationship between DirectSat and Bennett's companies indicate the absence of control by DirectSat. See Section A.2.a, supra.

The second element of this exemption can be satisfied if either condition applies – i.e., the individual performs his work outside either the "usual course of business" or "all of the places of business of the employer." Novakovic, 820 N.E.2d at 974, 354 Ill. App. 3d at 669 (citing 820 ILCS § 115/2). In this case, Bennett's companies operated from rented offices or his personal residence, and performed installation work at DirecTV's customers' homes, not DirectSat's places of business.

Regarding the third and final element of this exemption, the Illinois Administrative Code provides that an "independently established trade, occupation, profession or business" means that the "individual performing the services has a proprietary interest in such business, to the extent that he/she operates the business without hindrance from any other person and, as the enterprise's owner, may sell or otherwise transfer the business." 56 Ill. Adm. Code § 300.460(a)(2). As discussed above, Bennett wholly owned and operated Illinois installation companies that pre- and post-dated his working relationship with DirectSat. SOF, ¶¶ 7, 79. As sole owner of these companies, he had a proprietary interest in them and operated them without hindrance. Therefore, all three elements of the independent contractor exemption are satisfied, and, as a result, Bennett's IWPCA claims also fail as a matter of law.

**V.     CONCLUSION**

For all the foregoing reasons, Defendants respectfully request that this Court grant their Motion and enter judgment in favor of Defendants as to James Bennett's claims.

Respectfully submitted,

/s/ Colin D. Dougherty
COLIN D. DOUGHERTY

DATED:  January 14, 2013                *One of the Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I, Colin D. Dougherty, hereby certify that, on this date, I caused the foregoing document

to be filed electronically with this Court, where it is available for viewing and downloading from

the Court's ECF system, and that such electronic filing automatically generates a Notice of

Electronic Filing constituting service of the filed document, upon the following:

Robin B. Potter, Esquire
ROBIN POTTER & ASSOCIATES, P.C.
111 East Wacker Drive, Suite 2600
Chicago, IL 60601

Attorneys for Plaintiffs

/s/ Colin D. Dougherty
COLIN D. DOUGHERTY

DATED:  January 14, 2013