**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JAMES BENNETT, *et al.*, | |
| Plaintiffs, | Civil Action |
| | Jury Trial Demanded |
| v. | No. 1:10-cv-04968 |
| UNITEK GLOBAL SERVICES LLC, *et al.*, | Judge Harry D. Leinenweber |
| Defendants. | |

---

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFFS
JERMAINE LITT AND JEROME GARRISON**

---

**BUTLER RUBIN SALTARELLI & BOYD LLP**
Jason S. Dubner (ARDC # 06257055)
Ursula A. Taylor (ARDC # 6287522)
70 West Madison Street, Suite 1800
Chicago, IL 60602
(312) 444-9660

**FOX ROTHSCHILD LLP**
Colin D. Dougherty
Jonathan D. Christman
Fox Rothschild LLP
10 Sentry Parkway, Suite 200
P.O. Box 3001
Blue Bell, PA 19422-3001
(610) 397-6500

*Attorneys for Defendants*

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL BACKGROUND ............................................................................... 1

      A.    Parties ................................................................................................... 1

      B.    The Litt-Garrison Companies ................................................................ 2

      C.    The Independent Contractor Agreements Between DirectSat and the Litt-Garrison Companies ................................................................ 3

III.  STANDARD OF REVIEW................................................................................. 5

IV.   ARGUMENT...................................................................................................... 6

      A.    The FLSA Claims of Jermaine Litt and Jerome Garrison Fail As a Matter of Law. ...................................................................................... 6

            1.    The FLSA Does Not Apply To Independent Contractors......................... 6

            2.    Jermaine Litt and Jerome Garrison Were Independent Contractors Under the FLSA............................................................ 7

                  a     The Nature and Degree of Control................................................ 8

                  b     Opportunity for Profit and Loss .................................................. 11

                  c     Investment in Equipment and Employment of Others ................. 14

                  d     Special Skill ................................................................................ 15

                  e     Degree of Permanency in Working Relationship......................... 16

                  f     Integral Part of Business. ............................................................ 17

      B.    The Illinois State Law Claims of Jermaine Litt and Jerome Garrison Also Fail As a Matter of Law....................................................................... 18

            1.    Litt and Garrison Were Independent Contractors Under the IMWL......... 18

            2.    Litt and Garrison Were Independent Contractors Under the IWPCA. ................................................................................................. 19

V.    CONCLUSION................................................................................................ 20

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Adams v. Catrambone,
  359 F.3d 858 (7th Cir. 2004) ............................................................................. 18

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242 (1986) ............................................................................................ 4

Bulaj v. Wilmette Real Estate & Mgmt. Co.,
  No. 09-6263, 2010 WL 4237851 (N.D. Ill. Oct. 21, 2010) (Kim, J.) .............. 5, 17

Celotex Corp. v. Catrett,
  477 U.S. 317 (1986) ............................................................................................ 4

Chao v. Mid-Atlantic Installation Servs.,
  16 Fed. Appx. 104 (4th Cir. 2001) ....................................... 6, 9, 10, 11, 13, 14, 16

Dole v. Amerilink Corp.,
  729 F. Supp. 73 (E.D. Mo. 1990) ................................... 7, 8, 9, 10, 12, 13, 14, 16

EEOC v. Century Broad. Corp.,
  No. 89-5842, 1990 WL 43286 (N.D. Ill. Mar. 23, 1990) ................................... 10

Estate of Suskovich v. Anthem Health Plans of Virginia, Inc.,
  553 F.3d 559 (7th Cir. 2009) .............................................................................. 5

Franzoni v. Hartmarx Corp.,
  No. 99-4998, 2001 WL 243394 (N.D. Ill. Mar. 12, 2001) (Leinenweber, J.) ......... 4

Freund v. Hi-Tech Satellite,
  185 Fed. Appx. 782 (11th Cir. 2006) ....................................... 6, 8, 11, 13, 14, 15

Jaramillo v. Garda, Inc.,
  No. 12-0662, 2012 WL 4955932 (N.D. Ill. Oct. 17, 2012) ................................. 4

Karr v. Strong Detective Agency, Inc.,
  787 F.2d 1205 (7th Cir. 1986) ............................................................................ 5

Lizak v. Great Masonry, Inc.,
  No. 08-1930, 2009 WL 3065396 (N.D. Ill. Sept. 22, 2009) ............................... 17

Novakovic v. Samutin,
  820 N.E.2d 967, 354 Ill. App. 3d 660 (1st Dist. 2005) ....................................... 18

People ex rel. Dep't of Labor v. MCC Home Health Care, Inc.,
   790 N.E.2d 38, 339 Ill. App. 3d 10 (1st Dist. 2003) ........................................................ 17

Scantland v. Jeffry Knight, Inc.,
   No. 09-1985, 2012 WL 1080361 (M.D. Fla. Mar. 29, 2012) ....... 6, 8, 9, 10, 11, 12, 13, 14, 15

Sec. of Labor, U.S. Dept. of Labor v. Lauritzen,
   835 F.2d 1529 (7th Cir. 1987) ................................................ 5, 6, 7, 10, 12, 14, 15, 16, 17

U.S. v. Silk,
   331 U.S. 704 (1947) ........................................................................................................ 5

Vince v. Ill. Central Sch. Bus, LLC,
   No. 09-5360, 2011 WL 578832 (N.D. Ill. Feb. 9, 2011) (Leinenweber, J.) .......................... 4

Worth v. Tyer,
   276 F.3d 249 (7th Cir. 2001) ........................................................................................ 15


**STATUTES**

820 ILCS §§ 105/1 et seq., and .............................................................................................. 16

820 ILCS §§ 115/1 et seq. .................................................................................................... 16

820 ILCS § 115/2 .................................................................................................................. 18

29 U.S.C. § 201 ...................................................................................................................... 1

29 U.S.C. § 203(d) ................................................................................................................ 5

29 U.S.C. § 203(e)(1) ............................................................................................................ 5

29 U.S.C. § 203(g) ................................................................................................................ 5

Code § 300.460(a) ................................................................................................................ 18

Code § 300.460(a)(1) ............................................................................................................ 18

Code § 300.460(a)(2) ............................................................................................................ 19

Illinois State Law .................................................................................................................. 16

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(a) .............................................................................................................. 4

Illinois Administrative Code ........................................................................................... 17, 18, 19

Defendants DirectSat USA, LLC ("DirectSat") and UniTek Global Services, Inc. ("UniTek") (jointly, "Defendants"), by and through their attorneys, Fox Rothschild LLP and Butler Rubin Saltarelli & Boyd LLP, hereby submit this Memorandum of Law in support of their Motion for Summary Judgment as to Plaintiffs Jermaine Litt ("Litt") and Jerome Garrison ("Garrison").

## I.    INTRODUCTION

Notwithstanding the fact that Litt and Garrison signed multiple independent contractor agreements with DirectSat on behalf of Illinois installation companies they incorporated, co-owned, and jointly managed, they joined this action claiming they were employees of DirectSat and that DirectSat failed to pay them appropriate wages and proper overtime compensation in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq., and Illinois wage-and-hour law. In addition to the express terms of these independent contractor agreements, the undisputed facts of this case demonstrate that Litt and Garrison, the co-owners and co-managers of these companies, were not DirectSat employees but instead independent contractors. As such, this motion is ripe and all of their claims fail as a matter of law.

## II.    FACTUAL BACKGROUND

### A.    Parties

DirectSat is a Delaware limited liability company with its principal place of business in Montgomery County, Pennsylvania. SOF, ¶ 1. DirectSat employs individuals who install, upgrade, and service DirecTV customers and it also conducts business with subcontracting companies to perform installation work through the use of independent contractors. SOF, ¶¶ 3-4. Although DirectSat began operations before 2006, it did not operate in Illinois until late 2006 and it has operated continuously in Illinois since that date. SOF, ¶ 5. UniTek is a Delaware corporation with corporate offices located in Montgomery County, Pennsylvania. SOF, ¶ 2.

Litt and Garrison are individuals who claim in this action to have been employees of DirectSat and UniTek. They allege violations of the FLSA and Illinois state law. SOF, ¶ 6.[1]

## B. The Litt-Garrison Companies

Garrison and Litt were co-owners of Professional Services, Inc. ("Professional Services"), a company they originally started with three other individuals. SOF, ¶ 7. When these individuals left, Garrison and Litt, with their own trucks, tools and money, formed a new corporate entity in the state of Illinois that technically had a different name, but in its day-to-day operations was called Professional Services. SOF, ¶¶ 8, 10. Professional Services performed cable, satellite, and alarm system installation work with "anybody [they] could get a contract with." SOF, ¶ 9. Garrison and Litt were also co-owners of Sat1Pro, Inc. ("Sat1Pro"), an Illinois company that took over for Professional Services, and which operated out of the same location. SOF, ¶ 21. Both companies operated out of Garrison's personal residence. SOF, ¶¶ 49-50.

Litt and Garrison operated these companies as a business and took appropriate corporate formalities, and other actions, to that effect, including, inter alia, incorporation (SOF, ¶ 8), corporate reporting requirements and fees (SOF, ¶¶ 11, 15), paying state and federal taxes for the companies (SOF, ¶ 12), maintaining insurances (SOF, ¶¶ 16-18), keeping books and records (SOF, ¶ 19), obtaining federal employer identification numbers (SOF, ¶ 13), starting a business banking account (SOF, ¶ 14), employing technicians (SOF, ¶¶ 46-47), purchasing tools and vehicles and entering into written contractual agreements (SOF, ¶¶ 23-24, 26, 30, 35).

Garrison testified that the goal he and Litt shared for the company was to be the "biggest contracting company in Illinois." SOF, ¶ 20. In 2007, Professional Services "almost made a

---

[1]     This action was commenced by James Bennett ("Bennett"). (See D.E. 1.) A separate motion for summary judgment is being filed as to Bennett's claims.

million dollars" as a company, but in 2008, Professional Services was paid substantially less. SOF, ¶¶ 65-66. Litt admitted that starting these companies involved "risk." SOF, ¶ 22.

### C. The Independent Contractor Agreements Between DirectSat and the Litt-Garrison Companies

Litt and Garrison, as co-owners and co-managers of these companies, entered into independent contractor agreements with DirectSat on behalf of Professional Services in or around November 2006 and again in or around January 2009, and on behalf of Sat1Pro in or around April 2009. SOF, ¶¶ 23-24, 27-28, 30, 32-33, 35, 37-38.[2] The contractual term period for all of these agreements was one-year. SOF, ¶¶ 29, 34, 39. All three agreements identify the Litt-Garrison companies as an "Independent Contractor," "Contractor" or "Subcontractor." SOF, ¶¶ 25, 31, 36. None of these agreements referred to Litt and Garrison, or their companies, as anything other than a contractor. Garrison and Litt read all of these agreements before freely and voluntarily signing them on behalf of Professional Services and/or Sat1Pro. SOF, ¶ 40.

As set forth in these contracts, the Litt-Garrison companies had to supply their own tools, ladders, and vehicles because DirectSat did not provide them. SOF, ¶¶ 43-44. Within a week of signing the 2006 agreement, Litt and Garrison had about five technicians working for them, as permitted under the agreement, and ultimately had as many as twenty. SOF, ¶¶ 45-47. As co-owners and co-managers of the Litt-Garrison companies, Litt and Garrison chose not to provide any tools, vehicles, and installation materials to their companies' technicians. SOF, ¶¶ 67-68. Litt and Garrison also hired non-technicians to join the company, including a dispatcher and a payroll person, to lessen their management responsibilities. SOF, ¶ 48.

During the period of time when their companies were under contract with DirectSat, Garrison testified that he pretty much had to "do everything" and that his responsibilities as co-

---

[2]      UniTek was not a party to any of these agreements. SOF, ¶ 41.

owner of these companies included, among other things, serving as a field trainer for the their companies' technicians, supervising technicians, and evaluating their work. SOF, ¶¶ 51-54. Similarly, Litt testified that the "better question" was "what wasn't my role" with the company, as he was testified that he supervised technicians and was responsible for dispatching, payroll, warehousing, and customer service, along with picking up the satellite equipment for their companies' technicians at the DirectSat warehouse. SOF, ¶¶ 55-56, 58.

Under these agreements, the Litt-Garrison companies were free to accept or reject installation jobs. SOF, ¶ 60. The Litt-Garrison companies were also free to engage other independent contracting activities. SOF, ¶ 64. Upon accepting work orders under the agreements, the Litt-Garrison companies invoiced DirectSat for the installation work performed by the companies' technicians. SOF, ¶ 69. The Litt-Garrison companies were paid by DirectSat in weekly checks for all of the work performed by those technicians. Id. Then, the Litt-Garrison companies' technicians were paid on a piece-rate basis for their installation work from their companies' bank account. SOF, ¶¶ 70-71. On the other hand, non-technicians were not paid on a piece-rate basis – a decision made by Litt and Garrison. SOF, ¶¶ 71-72.

According to Litt, Professional Services' technicians were "financially successful" and "doing pretty good as far as making some money." SOF, ¶ 73. As a company, Professional Services chose to pay its technicians $60 for an installation job when it could have paid these technician less, which would have been "more money" for Garrison and Litt as co-owners. SOF, ¶ 74. Similarly, paying their technicians $70 for an installation job would have meant that Garrison and Litt received less money as co-owners and therefore, for various business reasons, including competition among their fellow subcontracting companies, they decided to "stay competitive" and pay $60 to a technician for an installation. SOF, ¶ 75. As co-owners of the

company, Garrison and Litt were not required to pay themselves, but they did anyway, as they were each paid more than $63,000 from Professional Services in 2007, and more than $25,000 by Professional Services in 2008. SOF, ¶¶ 76-77.

Pursuant to these agreements, the Litt-Garrison companies had to complete their installation jobs pursuant to certain minimum specifications, including safety standards, and the companies' installations were subject to quality control review. SOF, ¶¶ 53-54, 59. And, the Litt-Garrison companies could be backcharged based upon their failure to comply with certain installation guidelines. SOF, ¶ 61. And, when the Litt-Garrison companies were charged back by DirectSat based upon work performed by their technicians, or lost equipment, Litt and Garrison, as co-owners and co-managers of these companies, chose to pass that chargeback on to the companies' technicians at times and, at other times, "eat" the cost of the chargeback. SOF, ¶¶ 62-63. Finally, under the agreements, Litt and Garrison were also responsible for withholding taxes under these agreements. SOF, ¶ 12.

## III.   STANDARD OF REVIEW

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Jaramillo v. Garda, Inc., No. 12-0662, 2012 WL 4955932, at *1 (N.D. Ill. Oct. 17, 2012). "A fact is material if it could affect the outcome of the suit, and a dispute is genuine where the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Vince v. Ill. Central Sch. Bus, LLC, No. 09-5360, 2011 WL 578832, at *4 (N.D. Ill. Feb. 9, 2011) (Leinenweber, J.) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The moving party bears the burden of establishing the grounds for summary judgment "with the evidence demonstrating the absence of any genuine issue of material fact." Vince, 2011 WL 578832, at *4. Once the moving party has satisfied this burden, the nonmoving party "may

not rest on mere allegations, but must present specific facts showing that a genuine issue exists for trial." Id. Indeed, the "non-moving party 'must do more than show that there is some metaphysical doubt as to the material facts.'" Jaramillo, 2012 WL 4955932, at *1. Thus, to defeat a motion for summary judgment, the non-moving party "may not rest on its pleadings, but 'must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial.'" Franzoni v. Hartmarx Corp., No. 99-4998, 2001 WL 243394, at *3 (N.D. Ill. Mar. 12, 2001) (Leinenweber, J.) (citing Robin v. Espo Eng'g Corp., 200 F.3d 1081, 1088 (7th Cir. 2000)).

## IV.  ARGUMENT

### A.  The FLSA Claims of Jermaine Litt and Jerome Garrison Fail As a Matter of Law.

#### 1.  The FLSA Does Not Apply To Independent Contractors.

Critically, "[i]t is undisputed that the provisions of the FLSA do not apply unless there is a valid employer-employee relationship." Bulaj v. Wilmette Real Estate & Mgmt. Co., No. 09-6263, 2010 WL 4237851, at *4 (N.D. Ill. Oct. 21, 2010) (Kim, J.); see also Sec. of Labor, U.S. Dept. of Labor v. Lauritzen, 835 F.2d 1529, 1534-35 (7th Cir. 1987) ("independent contractors" not subject to FLSA requirements).[3] The determination of a worker's employment status is a legal determination. Karr v. Strong Detective Agency, Inc., 787 F.2d 1205, 1206 (7th Cir. 1986).

To determine whether an individual worker is an "employee" under the FLSA, this Court must consider the "six-factor test to determine the 'economic reality' of the situation." Estate of

---

[3]     The Act defines an employee as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). An "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). Moreover, under the FLSA, to "[e]mploy" means "to suffer or permit work." 29 U.S.C. § 203(g).

<u>Suskovich v. Anthem Health Plans of Virginia, Inc.</u>, 553 F.3d 559, 565 (7th Cir. 2009) (citing

<u>Lauritzen</u>, 835 F.2d at 1534). Those six factors are:

> 1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed; 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; 3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers; 4) whether the service rendered requires a special skill; 5) the degree of permanency and duration of the working relationship; 6) the extent to which the service rendered is an integral part of the alleged employer's business.

<u>Lauritzen</u>, 835 F.2d at 1534-35; <u>see also</u> <u>U.S. v. Silk</u>, 331 U.S. 704, 716 (1947). In applying

these factors to assess the "economic reality of the nature of the working relationship, courts do

not look to a particular isolated factor but to all the circumstances of the work activity."

<u>Lauritzen</u>, 835 F.2d at 1534.

## 2. **Jermaine Litt and Jerome Garrison Were Independent Contractors Under the FLSA.**

There can be no genuine dispute that Litt and Garrison, the co-owners and co-managers

of multiple Illinois installation companies were, in fact, independent contractors during the

period in which they now claim, in this lawsuit, to have been DirectSat employees. As shown

below, considering the six <u>Lauritzen</u> factors in the case at bar, the undisputed facts of this case

demonstrate that Litt and Garrison were not employees of the Defendants under the FLSA but

instead independent contractors.[4]

Indeed, several courts across the country considering wage-and-hour claims made by

cable and satellite installers, including the Fourth and Eleventh Circuits, have rejected such

---

[4] As noted above, no single factor is dispositive of an individual's employment status, and, in the same vein, not all factors need weigh in favor of the non-existence of an employee-employer relationship in order to conclude that an individual is, in fact, not an employee. <u>See</u> <u>Lauritzen</u>, 835 F.2d at 1534-35. With that said, because all six factors must be considered by this Court, they will be addressed in turn below.

claims and found these plaintiffs to be independent contractors rather than employees. See, e.g., Chao v. Mid-Atlantic Installation Servs., 16 Fed. Appx. 104, 106-08 (4th Cir. 2001) (citing Lauritzen, and affirming district court's summary judgment conclusion that cable installer was an independent contractor); Freund v. Hi-Tech Satellite, 185 Fed. Appx. 782, 783-84 (11th Cir. 2006) (citing Lauritzen, and affirming district court's determination that home satellite and entertainment installer was an independent contractor); Scantland v. Jeffry Knight, Inc., No. 09-1985, 2012 WL 1080361, at *5-6, *13-19 (M.D. Fla. Mar. 29, 2012) (granting defendants' motion for summary judgment after finding that technician installers were independent contractors under the six-factor test); Dole v. Amerilink Corp., 729 F. Supp. 73, 76-77 (E.D. Mo. 1990) (citing Lauritzen, and finding that cable installers were independent contractors). And, in fact, the evidence establishing independent contractor status in this case is even more compelling than the cases cited above as this action involves co-owners and co-managers (i.e., Litt and Garrison) of formally incorporated and independently existing corporate entities in Illinois (i.e., Professional Services and Sat1Pro) that employed the services of other technicians and non-technicians during the period in which they now claim to have been employees of DirectSat. Accordingly, Litt and Garrison were independent contractors, not employees. As such, the FLSA does not apply and, as a result, the claims of Litt and Garrison must fail as a matter of law.

a.   **The Nature and Degree of Control**

The first Lauritzen factor is the "nature and degree" of DirectSat's control "as to the manner in which the work is to be performed." See Lauritzen, 835 F.2d at 1535. Contrary to the assertions of Litt and Garrison, in the case at bar, DirectSat did not control the manner and amount of work they performed, or even whether they worked at all. Most importantly, before they ever had any working relationship with DirectSat, Litt and Garrison established their own subcontracting installation company incorporated in Illinois and, in fact, they had entered

contractual agreements with several other clients before contracting with DirectSat. SOF, ¶¶ 7-9, 26. They later started a new Illinois company that performed the same work. SOF, ¶ 21. That company, however, does not presently contract with DirectSat for work, even though DirectSat also continues to operate in the State of Illinois. SOF, ¶ 5.

Litt and Garrison operated these installation companies as a business and, on behalf of these companies, they did all of the following: (1) Paid the incorporation fee (SOF, ¶¶ 8, 15); (2) Made the annual corporate reporting requirements (SOF, ¶ 11); (3) Kept books and records (SOF, ¶ 19); (4) Paid state and federal taxes as a company (SOF, ¶ 12); (5) Requested and received a federal employer identification number (SOF, ¶ 13); (6) Opened and maintained business checking account (SOF, ¶ 14); (7) Maintained insurances (SOF, ¶ 16); (8) Employed technicians (SOF, ¶¶ 46-47); (9) Employed non-technicians (SOF, ¶ 48); and (10) Entered into written contractual agreements (SOF, ¶¶ 23-24, 26, 30, 35).

Thus, as co-owners and co-managers of these installation companies, Litt and Garrison operated them as a business, they had complete control of the services completed by these companies, and they were free to perform installation work for other companies. SOF, ¶¶ 7-8, 21, 64. DirectSat did not exercise control with regard to the hours Litt and Garrison worked, the installation jobs they performed, or even whether they worked at all. See Dole, 729 F. Supp. at 76; Scantland, 2012 WL 1080361, at *15 (independent contractor agreement provided that technician installer was free to reject work orders, but alleged employer had discretion regarding the offer of work orders to technician installers). The Litt-Garrison companies were free to accept or decline work. SOF, ¶ 60. Also, DirectSat did not determine whether Litt and Garrison employed any individuals to assist them with their companies and, if so, how they decided to manage them as their supervisor. SOF, ¶¶ 45-48, 51-56; see also Dole, 729 F. Supp. at 76. In

fact, within a week of signing the 2006 agreement, Litt and Garrison had about five technicians working for them. SOF, ¶ 46. They had as many as twenty technicians working for the Litt-Garrison companies during the existence of these companies. SOF, ¶ 47.

Moreover, controlling the manner of work performed is not equivalent to maintaining minimum specifications for installations or imposing quality controls. See Freund, 185 Fed. Appx. at 783 (satellite installer's "certain minimum specifications" for installations was directed at "customer satisfaction" and "not with the day-to-day regulation of his work habits, hours worked or work methods"); see also Dole, 729 F. Supp. at 76 (the imposition of quality controls on cable installers is the type of constraint that "inheres in any subcontractor relationship"); Scantland, 2012 WL 1080361, at *14 (requiring technician installers to comply with "technical specifications" of the alleged employer's client is "consistent with the standard role of a contractor hired to perform highly technical tasks" and simply involves the "contractual warranties of timely work and quality"). Additionally, "backcharging" an installer for failing to satisfy such specifications does not indicate control but instead is characteristic of a contractor's role. See Scantland, 2012 WL 1080361, at *14; see also Chao, 16 Fed. Appx. at 106 (requiring cable installer to meet "installation specifications" is "entirely consistent with the standard role of a contractor who is hired to perform technical duties").

Thus, the foregoing authority explains, the specifications related to installations at DirecTV's customers' homes, as well as the imposition of quality controls, that were the subject of the independent contractor agreements entered into by the Litt-Garrison companies are inherent and typical for any contractor. See SOF, ¶¶ 53-54, 59. Moreover, any backcharges received by the Litt-Garrison companies for failure to meet certain specifications in installation jobs completed by their company are characteristic for any contractor. See SOF, ¶ 61. Litt and

Garrison, as co-owners and co-managers of their installation companies, were "responsible for the manner and means of performance of the work, including performing the work free from defects, for assuring compliance with applicable safety standards, for selecting and assigning their employees, supervising their own employees, and paying all required taxes." See Scantland, 2012 WL 1080361, at *16. As such, the undisputed facts regarding the nature of the relationship between DirectSat and the Litt-Garrison companies indicate the absence of DirectSat control.

### b.     Opportunity for Profit and Loss

The second Lauritzen factor is the "opportunity for profit or loss" for Litt and Garrison "depending upon" their "managerial skill." See Lauritzen, 835 F.2d at 1535. In contrast to an employee, an independent contractor "risks loss of an investment and has the opportunity to increase profits through managerial discretion." EEOC v. Century Broad. Corp., No. 89-5842, 1990 WL 43286, at *4 (N.D. Ill. Mar. 23, 1990) (citing Lauritzen, 835 F.2d at 1536) (Conlon, J.). The incorporation and operation of a separate corporation "indicates the presence of independent entities, each having its own opportunity for profit and loss" because even if a corporation loses its primary client, its existence continues and it can seek new clients. Scantland, 2012 WL 1080361, at *17. As discussed extensively above, Litt and Garrison incorporated and operated separate and independent Illinois companies (i.e., Professional Services and Sat1Pro). SOF, ¶¶ 7-8, 21. The other company, Professional Services, pre-dated its contractual relationship with DirectSat. SOF, ¶¶ 7-8, 23, 26.

The profits or losses of Litt and Garrison, as the co-owners of their companies, were governed by their managerial discretion, in both the work they performed (i.e., how much, how fast, and how well) and the capital investments they made. See Chao, 16 Fed. Appx. at 106-07 (installer's net profit or loss "depends on his skill in meeting technical specifications, thereby avoiding backcharges; on the business acumen with which the Installer makes his required

capital investments in tools, equipment, and a truck; and on the installer's decision whether to hire his own employees or to work alone"); <u>Scantland</u>, 2012 WL 1080361, at *16-17 (completing more work orders, avoiding backcharges, and minimizing costs associated with the purchasing of a vehicle, tools, insurances, licenses); <u>see also</u> <u>Dole</u>, 729 F. Supp. at 76-77 ("rectifying and paying for any damage" caused or faulty installation, as well as purchasing tools, trucks, and insurance is indicative of economic independence and typical for contractors). Indeed, in 2007, Professional Services "almost made a million dollars" as a company, whereas, in 2008, it made substantially less. SOF, ¶¶ 65-66.

The profits or losses of Litt and Garrison were directly related to how much, how fast, and how well they (and their technicians) completed their work orders because their companies were paid for the number of installation jobs completed and any backcharges incurred were the result of their companies' failure to adhere to certain specifications. <u>See</u> SOF, ¶ 61; <u>see also</u> <u>Chao</u>, 16 Fed. Appx. at 107 (installer can control profits and losses by working "more or fewer hours and, more importantly, by improving their technique so that they can service more customers faster"); <u>Freund</u>, 185 Fed. Appx. at 783 ("by accepting more jobs, performing more efficiently and hiring employees, [installer] could earn greater sums of money"); <u>Scantland</u>, 2012 WL 1080361, at *16. Both payment and backcharge provided opportunities for profit or loss. Regarding payments, the Litt-Garrison companies received weekly checks for the installation work performed by their companies' technicians. SOF, ¶ 69. These technicians were then paid on a piece-rate basis from the Litt-Garrison companies' bank account. SOF, ¶¶ 70-71. Litt and Garrison recognized that they could have made "more money" if they paid their technicians at a lower job rate, but for various reasons, including, *inter alia*, "stay[ing] competitive" with other subcontracting companies, they chose a rate to pay their technicians for installations. SOF, ¶¶ 73-

75. The Litt-Garrison companies also employed non-technicians in dispatch and payroll positions and these persons were not paid on a piece-rate basis as Litt and Garrison decided. SOF, ¶ 71-72. Moreover, Litt and Garrison, as co-owners, paid themselves. SOF, ¶¶ 76-77.

Regarding backcharges, co-owners and co-managers of their subcontracting installation companies, Litt and Garrison chose, at times, to pass any backcharges on to their companies' technician who was responsible for the backcharge and at other times to "eat" that cost. SOF, ¶¶ 62-63. The fact that Litt and Garrison could not dictate the number of customers DirecTV has to service on a given day or the rate at which their company was paid for each job completed by a technician working for their company, they were "no less in control of [their] net profits as a result of these variables than typical independent contractors." Chao, 16 Fed. Appx. at 107; Scantland, 2012 WL 1080361, at *16.

Additionally, DirectSat did not provide Litt and Garrison with a vehicle, tools, or ladders to complete installations. SOF, ¶¶ 43-44. Instead, Litt and Garrison had to purchase their own tools and trucks, a substantial investment in capital that is typical of contractors. See Scantland, 2012 WL 1080361, at *17; Dole, 729 F. Supp. at 76. For business reasons, they chose not to make these purchases for any technicians working for their companies. See SOF, ¶¶ 67-68. The Litt-Garrison companies were also responsible for maintaining insurances and withholding taxes. SOF, ¶¶ 12-13. In fact, regarding insurances, Garrison testified that they shopped for the insurer that offered the maximum coverage at the "cheaper rate," as the premium for Professional Services' general liability insurance alone cost $1,200 per year. SOF, ¶¶ 17-18. Moreover, non-serialized installation equipment could be purchased from various sources. SOF, ¶ 57. All of these decisions regarding employees, equipment, insurances, taxes, and the like, affect their profit or loss margin as the co-owners of a company.

Furthermore, and critically, the decision of Litt and Garrison, on behalf of their companies, to enter a written contractual agreement with another company demonstrates the very essence of their opportunity for profit or loss. Before Professional Services ever entered into an independent contractor agreement with DirectSat in 2006, it had a written contractual agreement with several different companies. SOF, ¶ 26. In all of the agreements entered into between DirectSat and the Litt-Garrison companies, Litt and Garrison acknowledged that their companies were independent contractors, and not employees, of DirectSat. SOF, ¶¶ 25, 31, 36. Thus, as demonstrated above, any profit or loss is their own and "results from [their] own efforts." See Dole, 729 F. Supp. at 77. As such, the undisputed facts demonstrate that Litt and Garrison, as the co-owners of incorporated companies, had the opportunity for individual profit and loss and that this opportunity is directly tied to their managerial skill.

### c. Investment in Equipment and Employment of Others

The third Lauritzen factor is the "investment" of Litt and Garrison in "equipment or materials required for [their] task, or [their] employment of workers." See Lauritzen, 835 F.2d at 1535. In this case, the investment of Litt and Garrison in equipment and materials is substantial. As discussed above, Litt and Garrison had to purchase their own equipment, such as ladders and tools, to perform installations for DirecTV customers and supply their own vehicles because DirectSat did not provide these materials to them. SOF, ¶¶ 43-44. As other courts have found under circumstances involving other installers, these substantial investments strongly weigh in favor of concluding that Litt and Garrison were independent contractors. See Scantland, 2012 WL 1080361, at *17 (technician installers "provided their own vehicles, paid for their own gas, purchased their own tools and safety equipment, purchased their own commercial liability and automobile insurance, paid for uniforms and signs, paid for their own telephone service, and paid their own taxes"); Freund, 185 Fed. Appx. at 783-84 (plaintiff installer "procured all of the

14

equipment necessary to perform the installations," "drove his own vehicle," and "provided his own tools and supplies for each installation").

The fact that many of these expenses were the subject of the independent contractor agreements that Litt and Garrison, as co-owners of their companies, signed with DirectSat does not alter the significance of these investments. In <u>Chao</u>, the contract between the plaintiff installers and the alleged employer required the installers in that case to supply their own trucks, a 28-foot ladder, specialized tools, uniforms, and pagers. 16 Fed. Appx. at 107; <u>see also</u> <u>Dole</u>, 729 F. Supp. at 76 (cable installers had to provide their own tools and trucks "in order to do work" for the alleged employer). Like here, installers in <u>Chao</u> were responsible for obtaining their own liability and automobile insurance and for withholding their own or any of their employees' taxes. 16 Fed. Appx. at 107; <u>see also</u> <u>Dole</u>, 729 F. Supp. at 76 (installers responsible for purchasing their own insurance).

These requirements are similar to independent contractor agreements at issue in this case. Pursuant to the terms of these agreements, Litt and Garrison were responsible for providing (and did provide) their own tools and vehicles, their own insurances, and tax withholdings. SOF, ¶¶ 12, 16, 43. All of these costs "are of a type not normally borne by employees." <u>Scantland</u>, 2012 WL 1080361, at *17; <u>see also</u> <u>Dole</u>, 729 F. Supp. at 76; <u>Chao</u>, 16 Fed. Appx. at 107. And, in addition to making significant capital expenditures on equipment, materials, and insurances, Litt and Garrison employed technicians (as many as twenty) and non-technicians (dispatch and payroll persons). SOF, ¶¶ 46-48. Thus, the undisputed facts regarding investment in equipment and the employment of others demonstrate that Litt and Garrison were independent contractors.

### d.    <u>Special Skill</u>

The fourth <u>Lauritzen</u> factor is whether the "service rendered" by Litt and Garrison "requires a special skill." <u>See</u> <u>Lauritzen</u>, 835 F.2d at 1535. In this case, Litt and Garrison

performed satellite installation work pursuant to contractor agreements they entered on behalf of their installation companies with DirectSat. SOF, ¶¶ 23-24, 27-28, 30, 32-33, 35, 37-38. Litt and Garrison were not trained by DirectSat. SOF, ¶ 42. Several courts have concluded that individuals performing similar satellite and cable installation work possessed "special skills" in order to perform their work. See Chao, 16 Fed. Appx. at 107 (skills of cable installer are "akin to those of carpenters, construction workers, and electricians"); Freund, 185 Fed. Appx. at 784 (home satellite and entertainment installer had special skills); Dole, 729 F. Supp. at 77 (concluding that cable installers "possess the special skills of carpenters and electricians"); Scantland, 2012 WL 1080361, at *17 (technicians who install and repair high-speed internet, cable television, and telephone services involve "technical skill"). Accordingly, the undisputed facts regarding the installation work of Litt and Garrison, along with the skill exercised in managing 20 technicians and several non-technicians working for them, involve similar special skills demonstrating that they were independent contractors.

### e. Degree of Permanency in Working Relationship.

The fifth Lauritzen factor is the "degree of permanency and duration of the working relationship" between Litt and Garrison, and DirectSat. See Lauritzen, 835 F.2d at 1535. "Contracts of a set length often indicate independent contractor status." Worth v. Tyer, 276 F.3d 249, 264 (7th Cir. 2001) (citing Mazzei v. Rock N Around Trucking, Inc., 246 F.3d 956, 965 (7th Cir. 2001)). In this case, the working relationship between Litt and Garrison, and DirectSat, was not permanent. Litt and Garrison signed several separate independent contractor agreements with DirectSat, one in 2006 and two in 2009. Also, pursuant to the contractual terms of these agreements, the duration of the relationship between DirectSat and the Litt-Garrison companies

was the set length of one-year, unless the agreement was terminated. SOF, ¶¶ 29, 34, 39; see also

Worth, 276 F.3d at 264 (contracts for a set length of time signify independent contractor status).[5]

Also, the agreements allowed Litt and Garrison to enter other contractual agreements for

installation work during their relationship with DirectSat. SOF, ¶ 64; see also Freund, 185 Fed.

Appx. at 784 (working relationship not permanent because plaintiff installer "was able to take

jobs from other installation brokers" and plaintiff "could take as many or as few jobs as he

desired"). Further, in the agreements, Litt and Garrison acknowledged that their companies were

independent contractors, and not employees, of DirectSat. SOF, ¶¶ 25, 31, 36. Thus, the

undisputed facts regarding the lack of permanency in the relationship between DirectSat and the

Litt-Garrison subcontracting companies demonstrate that they were independent contractors.

### f.    Integral Part of Business.

The sixth and final Lauritzen factor is the extent to which the "service rendered" by Litt

and Garrison is an "integral part" of DirectSat's business. See Lauritzen, 835 F.2d at 1535. Even

if this factor appears to weigh in favor of employment because DirectSat only provides

fulfillment installation services to DirecTV and contracts with subcontracting companies to

provide some of these services[6], it is not dispositive. See Lauritzen, 835 F.2d at 1534-35 (no

single factor is controlling in determining an individual's employment status). Given all of the

undisputed evidence demonstrating that Litt and Garrison were independent contractors, the fact

that DirectSat's only client is DirecTV "does not alter the overall impression" that the Litt-

Garrison subcontracting installation companies are "economically independent" from DirectSat.

See Dole, 729 F. Supp. at 77 (importance of cable installers to alleged employer did not "tip" the

balance toward a finding of an employee-employer relationship); Chao, 16 Fed. Appx. at 107-08.

---

[5]    In fact, the latter agreement, executed in April 2009, was terminated. SOF, ¶ 39.

**B.** **The Illinois State Law Claims of Jermaine Litt and Jerome Garrison Also Fail As a Matter of Law.**

Litt and Garrison have also asserted claims under Illinois wage-and-hour law: the Illinois Minimum Wage Law ("IMWL"), 820 ILCS §§ 105/1 et seq., and the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS §§ 115/1 et seq. For the same reasons discussed above, the state law claims of Litt and Garrison also fail as a matter of law.

**1.** **Litt and Garrison Were Independent Contractors Under the IMWL.**

With respect to the IMWL claims of Litt and Garrison, the Illinois Administrative Code provides six factors that are essentially *verbatim* to the six Lauritzen factors, discussed above, for determining whether a worker is an employee or independent contractor:

> [1] the degree of control the alleged employer exercised over the individual; [2] the extent to which the services rendered by the individual are an integral part of the alleged employer's business; [3] the extent of the relative investments of the individual and alleged employer; [4] the degree to which the individual's opportunity for profit and loss is determined by the alleged employer; [5] the permanency of the relationship; [and] [6] the skill required in the claimed independent operation.

See Lizak v. Great Masonry, Inc., No. 08-1930, 2009 WL 3065396, at *8 (N.D. Ill. Sept. 22, 2009) (citing 56 Ill. Adm. Code § 210.110) (Coar, J.); Bulaj, 2010 WL 4237851, at *10; see also People ex rel. Dep't of Labor v. MCC Home Health Care, Inc., 790 N.E.2d 38, 44-45, 339 Ill. App. 3d 10, 19-21 (1st Dist. 2003) (holding that the six-part test in the Illinois Administrative Code is the proper test for determining whether an individual is an employee or independent contractor under the IMWL). "Therefore, the inquiry for determining employment status under the IMWL is essentially the same as that under the FLSA." Bulaj, 2010 WL 4237851, at *10; Lizak, 2009 WL 3065396, at *8. Accordingly, for the reasons discussed in Section IV.A.1, supra,

---

[6]     Unlike DirectSat, Defendant Unitek does not have a contract with DirecTV.

the state law claims of Litt and Garrison under the IMWL fail as a matter of law because they are independent contractors, not employees under that statute.

2.    <u><strong>Litt and Garrison Were Independent Contractors Under the IWPCA</strong></u>.

Similarly, although the analysis under the IWPCA is slightly different from the parallel inquiry under the FLSA and IMWL, the claims of Litt and Garrison under this Illinois statute also fail for the same reason: Litt and Garrison were independent contractors. The IWPCA defines an "employee" as "any individual permitted to work by an employer in an occupation," but excludes from its definition of an employee any individual:

> (1) who has been and will continue to be free from control and direction over the performance of his work, both under his contract of service with his employer and in fact; and
>
> (2) who performs his work which is either outside the usual course of business or is performed outside all of the places of business of the employer unless the employer is in the business of contracting with third parties for the placement of employees; and
>
> (3) who is in an independently established trade, occupation, profession or business.

820 ILCS § 115/2. For an individual to be classified as an independent contractor under the IWPCA, Illinois courts hold that all three factors of this exclusion must be satisfied. <u>Adams v. Catrambone</u>, 359 F.3d 858, 864-65 (7th Cir. 2004); <u>Novakovic v. Samutin</u>, 820 N.E.2d 967, 973-74, 354 Ill. App. 3d 660, 668 (1st Dist. 2005); <u>see</u> <u>also</u> 56 Ill. Adm. Code § 300.460(a) ("All three conditions enumerated in Section 2 of the Act must be satisfied for the independent contractor exemption to apply."). "This exclusion is designed to distinguish between protected employees and independent contractors, who are not protected." <u>Adams</u>, 359 F.3d at 862 n.4.

Regarding the first element of this exemption, the Illinois Administrative Code provides that "control" means "the existence of general control or right to general control, even though the details of work are left to an individual's judgment." 56 Ill. Adm. Code § 300.460(a)(1). As

19

discussed above, the nature of the working relationship between DirectSat and the Litt-Garrison companies indicate the absence of control by DirectSat. See Section A.2.a, supra.

The second element of this exemption is satisfied if either condition applies – i.e., the individual performs his work outside either the "usual course of business" or "all of the places of business of the employer." Novakovic, 820 N.E.2d at 974, 354 Ill. App. 3d at 669 (citing 820 ILCS § 115/2). In this case, the Litt-Garrison companies operated from Garrison's personal residence, and performed installation work at DirecTV's customers' homes, not DirectSat's places of business. Regarding the third and final element of this exemption, the Illinois Administrative Code provides that an "independently established trade, occupation, profession or business" means that the "individual performing the services has a proprietary interest in such business, to the extent that he/she operates the business without hindrance from any other person and, as the enterprise's owner, may sell or otherwise transfer the business." 56 Ill. Adm. Code § 300.460(a)(2). As discussed above, Litt and Garrison co-owned and co-managed Illinois installation companies that pre- and post-dated their working relationship with DirectSat. SOF, ¶¶ 7-8, 21. As co-owners of these companies, they had a proprietary interest in them and operated them without hindrance. Thus, the independent contractor exemption is satisfied, and, as a result, the IWPCA claims of Garrison and Litt also fail as a matter of law.

V.     **CONCLUSION**

For all the foregoing reasons, Defendants respectfully request that this Court grant their Motion and enter judgment in favor of Defendants as to the claims of Jermaine Litt and Jerome Garrison.

Respectfully submitted,

/s/ Colin D. Dougherty
COLIN D. DOUGHERTY

DATED:  January 14, 2013                                *One of the Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I, Colin D. Dougherty, hereby certify that, on this date, I caused the foregoing document

to be filed electronically with this Court, where it is available for viewing and downloading from

the Court's ECF system, and that such electronic filing automatically generates a Notice of

Electronic Filing constituting service of the filed document, upon the following:

Robin B. Potter, Esquire
ROBIN POTTER & ASSOCIATES, P.C.
111 East Wacker Drive, Suite 2600
Chicago, IL 60601

Attorneys for Plaintiffs

/s/ Colin D. Dougherty
COLIN D. DOUGHERTY

DATED:  January 14, 2013